1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

The Honorable Barbara J. Rothstein

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

K.C. as guardian on behalf of minor G.C.,

     Plaintiff,

v.

EVERETT PUBLIC SCHOOLS,

     Defendant.

Case No. 2:24-cv-1838-BJR

**ORDER AFFIRMING DECISION OF ADMINISTRATIVE LAW JUDGE**

## I.    INTRODUCTION

Plaintiff K.C., as guardian of G.C., appeals an administrative law judge's decision that Defendant Everett Public Schools did not violate the Individuals with Disabilities Education Act, 20 U.S.C. § 1400 *et seq.* ("the IDEA"), provided G.C. with a free appropriate public education ("FAPE"), and was not responsible for the expense of G.C.'s private residential placements. Currently before the Court is Plaintiff's Opening Motion and Defendant's Response and Opening Brief.[1] Dkt. Nos. 16 & 18. Having considered the parties' arguments, the record of the case, and

---

[1]The parties agreed that this matter can be resolved on the certified administrative record that was filed by the Washington State Office of the Superintendent of Public Instruction and further agreed on a coordinated briefing schedule. Dkt. No. 9 at 2.

ORDER AFFIRMING DECISION OF ADMINISTRATIVE LAW JUDGE

- 1

relevant legal authorities, the Court affirms the administrative law judge's decision. The reasoning for the Court's decision follows.

## II.    BACKGROUND

### A.    Overview

G.C. ("Student"), now an adult, attended school in Everett Public Schools ("the District") from late-elementary school through eleventh grade. Student struggled in the school environment; he was evaluated in seventh grade and received diagnoses of ADHD, anxiety, and Autism Spectrum Disorder. It was determined that Student was eligible for special education services under the IDEA in the category of Emotional/Behavioral Disability and, thereafter, received specially designed instruction ("SDI") pursuant to an individualized education plan ("IEP") that was reviewed and, if necessary, modified annually in March of each school year.

This appeal centers on the 2021-2022 school year (September 2021-June 2022) when Student was in the eleventh grade at Henry M. Jackson High School ("Jackson"). During that year, Student attended three class periods per day at Jackson where he received his IEP-required SDI, and he attended a vocational program known as the Sno-Isle Diesel Power Technology Program ("Sno-Isle") offered by the Mukilteo School District the other half of the school day. Student's attendance at both Jackson and Sno-Isle began to decline during the first semester of that year and declined precipitously the second semester until he was ultimately hospitalized after a mental health crisis during the last month of the school year. Thereafter, Parent unilaterally placed Student in several residential treatment programs.

Parent alleges that the District violated the IDEA and failed to provide Student with a FAPE as a result of his excessive disability-related absences and the District's failure to develop an IEP reasonably calculated to mitigate Student's absences. She filed an administrative due

ORDER AFFIRMING DECISION OF ADMINISTRATIVE LAW JUDGE

- 2

process complaint, seeking reimbursement for the cost of Student's private placement and other compensatory relief. After a seven-day hearing, the Administrative Law Judge ("ALJ") concluded that Parent failed to establish that the District materially failed to implement Student's IEP and further failed to establish that the programming available to him was inappropriate at the time it was developed. Therefore, the ALJ concluded that Parent was not entitled to the relief she sought. Parent timely appealed to this Court.

### B.    Factual Background

#### 1.    Student's School Experience Pre-Eleventh Grade

Parent testified that Student engaged in self-harming behavior as early as first grade, but it worsened during middle and high school. Student also developed suicidal ideations in middle school, where he had multiple disciplinary incidents. In the fall of 2020, Student began his ninth-grade year at Jackson. He continued to receive SDI according to his IEP. His Special Education Case Manager was Susan Walker, a special education teacher at Jackson. In December 2019, a few months into his ninth-grade year, he "experienced an emotional breakdown" from "the stress he was experiencing at school related to bullying and a general lack of safety in the school environment." AR 3943. He was admitted to Fairfax outpatient therapeutic program where he received daily care between late December 2019 and February 2020 and missed three months of school.

In mid-March 2020, the District closed all schools for in-person instruction due to the COVID-19 Pandemic and Student attended school remotely. Parent reported that Student's mental health "improved somewhat" and "[h]is anxiety decreased" during this time "as a result of the decreased social stressors of the school environment." AR 3944. However, Parent testified

ORDER AFFIRMING DECISION OF ADMINISTRATIVE LAW JUDGE

1    that Student still "struggled to engage with remote learning" and to keep up with his assignments.

2    *Id*.

3    ## 2.    The March 2021 IEP

4    On March 17, 2021, when Student was in tenth grade, the Student's IEP Team met for its

5    annual review of Student's IEP ("the March 2021 IEP"). AR 1962-1986. The March 2021 IEP

6    stated that Student remained eligible for SDI under the category of Emotional/Behavioral

7    disability and was offered SDI in math calculation and behavior/social skills. AR 1966. The IEP

8    offered Student 275 minutes per week of SDI in behavior/social skills and 275 minutes per week

9    of SDI in math. AR 1972. It also provided for shared para support in the general education and

10   special education settings, and a number of accommodation and/or modifications, including extra

11   time on assignments, shortened assignments, and extra time on tests and quizzes. AR 1971. All

12   IEP team members, including Parent, agreed with Student's March 2021 IEP. AR 1974.

13   The IEP Team also developed a Behavioral Intervention Plan ("BIP") at the same meeting

14   ("the March 2021 BIP"). AR 1976-1986. The BIP stated that Student "is likely to engage in non-

15   compliant behaviors in an attempt to escape/avoid a demand or non-preferred activity." AR 1976.

16   "Non-compliant behaviors" included a heighted level of physical movement/fidgeting, hitting his

17   desk, negative self-talk, shutting down, putting his head on his desk, slumping in chair, and

18   excessive requests to use the restroom. *Id*. Triggers included transitions, non-preferred activities,

19   hunger, challenging activity, fatigue, changes in routine, being near someone he does not like,

20   auditory bombardment, and perceived unfair disciplinary action. AR 1977. The BIP stated that

21   providers should teach Student body awareness, emotion words, skills to aid in emotional

22   regulation, and problem-solving skills, among other things. AR 1978. In addition, behavioral cues

23   and verbal prompts should be used, cuing when it is time to switch between activities, use of clear

24   ORDER AFFIRMING DECISION OF ADMINISTRATIVE LAW JUDGE

25

and concise language, training for organizational skills, provide sensory breaks in his daily schedule, and provided rewards for positive behavior, among other strategies.[2] AR 1979

### 3.    Student's Eleventh-Grade Year (September 2021-June 2022)

Student's eleventh grade year began on September 8, 2021. At that point, classes had resumed in-person and Ms. Walker remained Student's special education case manager. Student continued to attend Jackson, but he had also been accepted into the Mukilteo School District Sno-Isle program, which provides trade skills in diesel power technology to prepare students for vocational pathways. Student was "very excited" about the Sno-Isle program because it allowed him hands-on learning and he was interested in diesel power technology. AR 961, 3945. Upon his acceptance to the program, Student's schedule was revised so that he would attend the Sno-Isle program first through third class periods and then return to Jackson for fourth through sixth class periods during which he took engineering, English, and social skills classes. His SDI in math and behavior/social skills were embedded in the engineering and social skills classes. He also took a United States History class online.

### 4.    The March 2022 IEP

On March 15, 2022, Student's IEP Team met for its annual review of Student's IEP ("the March 2022 IEP"). AR 2020 – 2050. The IEP Team determined that Student remained qualified for special education services under the category of Emotional/Behavioral disability in the areas of behavior/social skills and math calculation. In addition, Mr. Poe, Student's fourth period

---

[2]Parent participated in, reviewed, and accepted the March 2021 BIP. AR 1982. However, she did indicate that some of the foregoing non-compliant behaviors were not occurring at the time "although they were at the time of [Jackson's] closure." *Id*. Therefore, the IEP Team agreed to review and amended the March 2021 BIP "as necessary" once "in-person learning resume[d]." *Id*.

ORDER AFFIRMING DECISION OF ADMINISTRATIVE LAW JUDGE

- 5

engineering teacher, reported to the IEP Team that Student had not been attending his class despite being registered for it. *Id*. 2043.

The March 2022 IEP included essentially the same accommodations and modifications as were included in the March 2021 IEP but reduced the SDI minutes per week to 138 in behavior/social skills and 137 in math.[3] *Id*. at 2028-29. The IEP also offered shared para support in the general education and special education settings. *Id*. With respect to the fact that Student was not attending his engineering class, "[t]he [IEP] team developed a plan to catch [Student] up on missing [engineering] assignments while working in [the special education classroom]. Once he is caught up, the hope is [Student] will be comfortable with returning to class." *Id*. at 2043. Both Student and Parent attended the IEP meeting. *Id*. 2034.

The IEP Team also developed a new BIP on March 15, 2022 ("the March 2022 BIP"). AR 2036-2038. The March 2022 BIP was substantially similar to the March 2021 BIP.

### 5.    Student's Declining School Attendance

Parent testified that Student was always reluctant to attend school at Jackson; however, the focus of this appeal is Student's attendance during the 2021-2022 school year, Student's eleventh grade year. It is undisputed that Student's attendance began to decline the first semester of that year and declined precipitously the second semester. Jackson's attendance records show that during the first semester (September 2021-January 2022) Student had 10 absences in English, 21 absences in engineering, and 14 absences in social skills, and he ended the second

---

[3]The March 2022 IEP eliminated the following accommodations/modifications: assign peer tutor/note taker; provide outlines/guides/graphic organizers; allow use of calculator; provide homework and daily assignment lists; and allow use of spelling and grammar devices. *Compare* AR 1971 to 2040. The March 2022 IEP added the following accommodations/modifications: provide extra credit options, allow dictation to a scribe; and provide hands-on assignments. *Id*.

ORDER AFFIRMING DECISION OF ADMINISTRATIVE LAW JUDGE

semester (February 2022-June 2022) with 75 absences in English, 84 absences in engineering, and 72 absences in social skills. AR 3223.[4] Broken down even further, Jackson's attendance records indicate that between September 8 and December 17, 2021, Student missed at least one class period or all three class periods for twenty-one school days. AR 3841-42. Of those twenty-one days, five were related to illness/quarantine, four were "school related-Walker," seven were excused by Parent, and five were marked "no contact," meaning Parent did not contact the District regarding Student's absence. AR 3841-42. Jackson was on winter break from December 18, 2021 to January 3, 2022. Between January 4 and the end of the first semester on January 28, 2022, Student missed at least one class period or all three class periods for fourteen school days. AR 3842. Of those fourteen days, two were marked "early release," two were excused by Parent, and the remainder were marked "no contract." AR 3842. Jackson's attendance records for the second semester, February 2022 through June 2022, show that Student missed at least one class period or all three class period for 84 school days. AR 3843-3848. Eight of those days were excused for "travel," five were excused as "school related (Walker or Achieve)," twenty-three were excused by Parent, and the remainder are listed as "no contact." AR 3843-3848.

The evidence establishes that Student missed school during the 2021-2022 year for a number of reasons:

---

[4]Parent points out that Student also had 13 absences in the Sno-Isle program for the first semester and 54 absences in program for the second semester, and as will be discussed below, faults the ALJ for not considering those absences in her analysis of Parent's claim. AR 2912. However, the document Parent relies on for this information, a grade report from the Sno-Isle program that was emailed to the District on June 22, 2022 (AR 2910-12) was not admitted into evidence by the ALJ. Parent admits that the cited document was not admitted into evidence but cites to Parent's testimony at the hearing in which she states that she was having a difficult time getting Student to attend the Sno-Isle program as early as October 2022 (AR 586-87; *see also* 1035 (stating that she started noticing that he was reluctant to attend in the "November/December timeframe"). Dkt No. 19 at 8, n. 9. The other evidence cited to by Parent does not relate to Student's Sno-Isle attendance (*e.g.*, Ms. Gackle's testimony at AR 721-22).

1

### a.    Student's job

2    In December 2021, Student began working at a job from 2:00 to 5:00 each weekday

3    afternoon, which meant that he had to leave school before sixth period. The job allowed him to

4    "learn and practice skills in line with the Diesel Power Technology program he is enrolled in

5    through Sno-Isle." AR 1987. Student liked having the job and Parent and his teachers felt it

6    boosted his self-esteem. Given this, the Student's IEP Team worked with Student so that he could

7    continue with the job, despite having to miss sixth period every school day. The IEP Team

8    convened on January 12, 2022 to discuss his job and the impact of missing sixth period on the

9    Student's "ability to meet all of his graduation requirements." *Id*. The IEP Team proposed that

10    either Student start his job later in the day or he come in for a "30 minute 'work time' from 7:00

11    to 7:30 a.m. Monday-Friday with a dedicated staff member" before Student headed to the Sno-

12    Isle program. *Id*. at 1988. Thereafter, Parent spoke with Student's employer who agreed to allow

13    him to start work at 3:00 pm, which meant that he only had to miss the last five minutes of sixth

14    period. Student was terminated from his job in February 2022. The record is not entirely clear on

15    this point, but Parent alleges that ultimately Student only missed two class periods during January

16    2022 due to his job. Dkt. No. 16 at 15.

### b.    The January 14, 2022 incident

17

18    On January 14, 2022, Student had an incident in his fourth period engineering class at

19    Jackson. Five minutes before class ended, Student packed up his belongings and stood by the

20    door. When the substitute teacher, Ms. Branson, asked him to sit down, he flipped her off and

21    walked out of the classroom.[5] Student stopped attending his engineering class after that. Parent

22

23    _____

[5]Ms. Branson was a long-term substitute teacher because Mr. Poe, the regular engineering teacher, was on paternity
leave.

24    ORDER AFFIRMING DECISION OF ADMINISTRATIVE LAW JUDGE

25    - 8

was aware that he stopped attending the engineering class, but assumed that it was only until Mr. Poe, the regular teacher, returned to teaching the class. However, Student continued to skip the class even after Mr. Poe returned on February 1, 2022.

c.    **Incident in the Sno-Isle Program**

Initially Student was excited about attending the Sno-Isle program, but Parent alleges that by October 2021, she was having trouble getting him to attend the program. Parent testified that the self-paced and group project requirements in the program were challenging for him. Parent further testified that during the second semester Student had an issue with another student in the program, which may have resulted in his refusal to attend. AR 3945-46. The first that the District became aware of Student's absences from the Sno-Isle program was on April 20, 2022 when the program transmitted its third quarter grades to the District and the report indicated that Student had been absent 18 times that semester. Student eventually withdrew from the program. *Id*. at 3946.

d.    **New friend group**

In mid-May 2022, Student began associating with a new group of friends who were members of a gang and some of whom were drug dealers. AR 1244, 1257-58. He hung out with them until the early hours of the morning and at one point he and an acquaintance robbed a drug dealer, although the record is unclear as to the extent of Student's involvement in the crime. *Id*. at 1244-45. There was also an incident involving a ghost gun but, again, the record is unclear as to the extent of the Student's involvement. *Id*. at 1245. During this time, Parent noticed that Student's appearance had changed, including that he had shaved his head. Student further testified that on the days he did not go to school it was because he "went to hang out with [his] friends

ORDER AFFIRMING DECISION OF ADMINISTRATIVE LAW JUDGE

- 9

who were gang members." AR 1247. He claimed that he hung out with them because they "made [him] feel kind of cool and powerful." *Id.* at 1248.

Parent reported to Joshua Cluff, a clinical psychologist who completed a psychological evaluation of Student after he was admitted to SPARK Academy at Heritage RTC, a residential treatment center in Provo, Utah ("SPARK Academy"), that during this time (*i.e.*, mid-May through mid-June 2022), Student developed an "increasingly dark ideation … including hate speech [] associated with things such as right-wing extremism" and he "placed more and more emphasis on provoking his parents" and others, and that there seemed to be "a drive to provoke and upset, but also to intimidate." AR 2107. Student reported to Dr. Cluff that during this time he started gravitating "toward dark content and interests that were extreme and hate-filled" and "being more easily tipped into … rageful episodes." AR 2105. He reported that he "was abusing cannabis all day every day and that when he was not high, he was overrun with anger and hatred." *Id.*

### e.    Substance abuse

Student testified that he started using marijuana in school his freshman year. He was doing it "a few times a week" for a "couple periods of class a day." AR 1243. By eleventh grade, he was using marijuana "[d]aily, multiple times a day" including during school hours. AR 1246. He continued to use marijuana "until the day [he] was taken to the [residential treatment program]". AR 1253. However, he also testified that this did not represent a significant increase from his prior cannabis use. *Id.*

### 6.    Student Starts Attending School Remotely

On April 27, 2022, Parent emailed Brenda Felder (a graduation success coordinator for the District), Sara Burdick (a school counselor at Jackson), and Ms. Walker, informing them that she

ORDER AFFIRMING DECISION OF ADMINISTRATIVE LAW JUDGE

was having a difficult time getting Student to attend school. She noted that while he did not want

to attend classes in person anymore at Jackson, he did want to graduate and so wanted to know

what his options were. Parent followed up with another email on May 10, 2022 reiterating the

difficulties they were having at home getting Student to attend school and wondering what his

options were for graduating. The next day, on May 11, Student met with Ms. Felder, Ms. Burdick,

and Jennifer Linder (a District graduation success coordinator) and discussed his options for

graduating. AR 3179. They discussed "several options, all that include a pathway to a high school

diploma" including Grad Alliance, an online program offered by the District. *Id*. However,

according to Ms. Felder, Student decided that he wanted to remain enrolled in Jackson and focus

on completing his current classes with a passing grade. Cathy Fisher, a para support provider at

Jackson with whom Student had a good relationship "offered to support him in whatever way

possible, including meeting with him after school." *Id*. During this meeting, Student decided that

he wanted to come to Jackson two times a week during fourth period to work with his special

education team and the remainder of the time he would work remotely from home. AR 3180. On

May 12, 2022, Ms. Felder informed Student's teachers of his decision to work remotely from

home.

### 7.    Student Is Hospitalized Following Incident at Home

On June 14, 2022, Student became extremely upset over a falling out with friends and

reported to Parent that he wanted "to kill a drug dealer." AR 1246-47. He had an emotional

meltdown, threw his clothes into a pile in the backyard, doused them with gasoline, and held a

knife to his throat and threatened to kill himself. AR 3949. Parent contacted law enforcement and

Student was hospitalized. Thereafter, on June 16, Parent, through counsel, notified the District of

her intent to unilaterally place Student in a residential treatment program and to seek

ORDER AFFIRMING DECISION OF ADMINISTRATIVE LAW JUDGE

reimbursement from the District for the cost of the private placement. Student was eventually placed in the following three out-of-state residential treatment centers: (1) Triumph Youth Academy (July 2022 through August 2022), (2) Provo Canyon (August 2022 through September 2022), and SPARK Academy (September 2022 through June 2023).

Ultimately Student was able to obtain enough credits while at SPARK Academy to graduate from high school at the end of the 2022-2023 school year. He returned home in June 2023 and is currently working. Both Parent and Student report that his time in the residential treatment centers, particularly at SPARK Academy, helped him academically, emotionally, socially, and behaviorally.

### C.    Procedural Background

On June 26, 2023, Parent filed a request for a due process hearing. The hearing was held before Administrative Law Judge Pamela Meotti April 23 – 26, and May 7, 10, and 21, 2024, via videoconference. The issues before the ALJ were:

1.    Whether, between June 26, 2021 and July 1, 2022, the District violated the IDEA and denied Student a FAPE by:

    a.    Failing to implement Student's March 2021 IEP and/or the March 2022 IEP by failing to deliver the specially designed instruction as written in light of Student's excessive disability-related absences and inability to access his FAPE;[6]

    b.    Failing to develop programming reasonably calculated to mitigate Student's excessive disability-related absences; and

---

[6] Given that the relevant time period in this matter is June 26, 2021 through July 1, 2022 (based on the date of Parent's due process filing), both the March 2021 IEP and the March 2022 IEP are relevant. The March 2021 IEP governs June 26, 2021 through March 14, 2022 and the March 2022 IEP governs March 15, 2022 through July 1, 2022.

ORDER AFFIRMING DECISION OF ADMINISTRATIVE LAW JUDGE

- 12

c.      Failing to draft IEPs reasonably calculated to offer Student programming and placement in an appropriately therapeutic setting;

2.      Whether Student's unilateral placement in each of the three out-of-state residential treatment centers was appropriate and reasonably calculated to meet the Student's needs; and

3.      Whether Parent is entitled to reimbursement for the expense of the residential treatment centers, including insurance copays, related costs, and interest.[7]

AR 1414, 1868-69.

The ALJ issued the Findings of Fact, Conclusions of Law, and Final Order in August 2025. *Id*. at 1866–1904. The ALJ determined that Parent did not demonstrate a material failure by the District to implement Student's March 2021 and 2022 IEPs when he attended school. Nor did the Parent demonstrate that the March 2022 IEP was not reasonably calculated to meet Student's educational needs. Thus, the ALJ concluded that the District did not violate the IDEA and denied Parent's request for reimbursement for her unilateral decision to place Student in residential treatment programs. Parent appeals the ALJ's decision.

## III.    LEGAL STANDARD

Pursuant to the IDEA, an aggrieved party may bring a civil action in federal district court after receiving the final decision of an ALJ.[8] 20 U.S.C. § 1415. The party challenging the ALJ's

---

[7]Parent also sought declaratory relief, a compensatory education that provides the educational benefit to which Student is entitled, an order that the District provide training to its staff for every violation of the IDEA, and other equitable remedies.

[8]Although motions for review of administrative proceedings under the IDEA are frequently referred to as motions for summary judgment, the court does not follow "a true summary judgment procedure." *L.R.L. ex rel. Lomax v. District of Columbia*, 896 F.Supp.2d 69, 73 (D.D.C. 2012) (quoting *Ojai Unified Sch. Dist. v. Jackson*, 4 F.3d 1467, 1472 (9th Cir. 1993)). Where, as here, "neither party submits additional evidence for the court's review, 'the motion for summary judgment is simply the procedural vehicle for asking the judge to decide the case on the basis of the administrative record.'" *Q.C-C. v. District of Columbia*, 164 F. Supp. 3d 35, 44 (D.D.C. 2016) (quoting *Heather S. v. Wisconsin*, 125 F.3d 1045, 1052 (7th Cir. 1997)); *see also*, *Ojai*, 4 F.3d at 1472 (noting that "the district court essentially conduct[s] a bench trial based on a stipulated record).

ORDER AFFIRMING DECISION OF ADMINISTRATIVE LAW JUDGE

- 13

decision bears the burden of demonstrating that the hearing officer's conclusion should be reversed. *J.W. v. Fresno Unified Sch. Dist.*, 626 F.3d 431, 438 (9th Cir. 2010). "When a party challenges the outcome of an IDEA due process hearing, the reviewing court receives the administrative record, hears any additional evidence, and, 'basing its decision on the preponderance of the evidence, shall grant such relief as the court determines is appropriate.'" *R.B. v. Napa Valley Unified Sch. Dist.*, 496 F.3d 932, 937 (9th Cir.2007) (quoting 20 U.S.C. § 1415(i)(2)(B)). Thus, courts "review whether the state has provided a FAPE de novo." *M.C. by & through M.N. v. Antelope Valley Union High Sch. Dist.*, 858 F.3d 1189, 1194 (9th Cir. 2017). However, the fact that the reviewing court is required to "'receive the records of the [state] administrative proceedings' carries with it the implied requirement that due weight shall be given to these proceedings." *Bd. of Educ. of Hendrick Hudson Cent. Sch. Dist., Westchester Cnty. v. Rowley*, 458 U.S. 176, 206 (1982) (clarifying that "the provision that a reviewing court base its decision on the 'preponderance of the evidence' is by no means an invitation to the courts to substitute their own notions of sound educational policy for those of the school authorities which they review"); *see also Van Duyn ex rel. Van Duyn v. Baker School Dist*. 5J, 502 F.3d 811, 817 (9th Cir. 2007) (stating that complete de novo review of the administrative proceeding is inappropriate).

## IV.     DISCUSSION

### A.     Statutory Context

"The IDEA is a comprehensive educational scheme" that confers on students with disabilities "a substantive right to public education." *Fresno Unified*, 626 F.3d at 432 (quoting

ORDER AFFIRMING DECISION OF ADMINISTRATIVE LAW JUDGE

- 14

*Hoeft v. Tucson Unified Sch. Dist.*, 967 F.2d 1298, 1300 (9th Cir. 1992)). The IDEA's primary

purpose is "to ensure that all children with disabilities have available to them a free appropriate

public education ... designed to meet their unique needs and prepare them for further education,

employment, and independent living." 20 U.S.C. § 1400(d)(1)(A). "This purpose is achieved

through the development of an individualized education program ('IEP') for each child with a

disability." *Ojai Unified School Dist. v. Jackson*, 4 F.3d 1467, 1469 (9th Cir. 1993) (citing 20

U.S.C. § 1401(a)(18)(D)). "The IEP is 'the centerpiece of the statute's education delivery

system'" and "must aim to enable the child to make progress" that is "appropriate in light of the

child's circumstances." *Endrew F. ex rel. Joseph F. v. Douglas Cty. Sch. Dist. RE-1*, 580 U.S.

386, 391, 399-400 (2017) (quoting *Honig v. Doe*, 484 U.S. 305, 311 (1988)). While school

districts are not required to "maximize each child's potential," they must provide a "basic floor of

opportunity." *Rowley*, 458 U.S. at 198, 200.

 The IEP is developed annually by a team that includes a representative of the local

educational agency, the child's teacher, parents or guardians, and, if appropriate, the child. *Ojai*, 4

F.3d at 1469 (citing 20 U.S.C. § 1414(a)(5)). The IEP consists of a written document that must

include a statement of the child's academic and function performance, goals and how those goals

will be measured, and the type and amount of services to be provided, among other requirements,

and must be reviewed at least annually. *Fresno Unified*, 626 F.3d at 432.

Parents of children who qualify for services under the IDEA may bring procedural or

substantive challenges to their child's IEP. A challenge regarding the implementation of an IEP—

such as the school's failure to provide services that are listed in the IEP—is typically considered a

procedural challenge under the IDEA. In contrast, a challenge regarding the contents of the IEP—

such as the failure to include appropriate goals, services, or accommodations necessary to meet

ORDER AFFIRMING DECISION OF ADMINISTRATIVE LAW JUDGE

the child's unique needs—is considered a substantive challenge. *See Fresno Unified*, 626 F.3d at 432. "A procedural violation denies a free appropriate public education if it results in the loss of an educational opportunity, seriously infringes the parents' opportunity to participate in the IEP formulation process or causes a deprivation of educational benefits." *J.L. v. Mercer Island Sch. Dist.*, 592 F.3d 938, 953 (9th Cir. 2009). A substantive violation occurs if an IEP is not reasonably calculated to enable the child to receive educational benefits. *Fresno*, 626 F.3d at 432.

### B.   Level of Deference Owed to the ALJ's Findings of Fact and Conclusions of Law

As an initial matter, Parent urges this Court to give little, if any, deference to the ALJ's findings of fact and conclusions of law, asserting that the ALJ "failed to thoroughly and carefully consider the evidence," made several findings of fact that "omitted or otherwise framed evidence that contradicts [the ALJ's] theory of the case," and "ignored key evidence in reaching her legal conclusions." Dkt. No. 16 at 5. It is a matter of court discretion as to the degree of deference to give an ALJ's determinations, *Ojai*, 4 F.3d at 1472, however, "the fact-intensive nature of a special education eligibility determination coupled with considerations of judicial economy render a more deferential approach appropriate," *Hood v. Encinitas Union Sch. Dist.*, 486 F.3d 1099, 1104 n.4 (9th Cir. 2007). And courts give particular deference to "thorough and careful" administrative findings. *Union Sch. Dist. v. Smith*, 15 F.3d 1519, 1524 (9th Cir. 1994).

The Court will address any alleged errors in the ALJ's findings of fact and conclusions of law when resolving the merits of Parent's claims, applying such deference as the Court concludes is warranted while keeping in mind the following two principles: (1) this Court must not substitute its "own notions of sound educational policy for those of the school authorities which [it] review[s]," *Rowley*, 458 U.S. at 206, and (2) it is ultimately this Court's "obligation to

ORDER AFFIRMING DECISION OF ADMINISTRATIVE LAW JUDGE

determine whether the [District] has complied with the procedural and substantive requirements of the [IDEA]." *Edmonds School District v. A.T.*, 299 F. Supp. 3d 1135, 1138 (W.D. Wash. 2017).

### C.    Analysis

As stated above, the ALJ determined that Parent did not establish that the District materially failed to implement Student's IEPs during the 2021-2022 school year, nor did Parent establish that the IEP developed for him during that school year was not appropriate to meet his educational needs. The ALJ thus concluded that the District did not violate the IDEA and denied Parent's request for reimbursement for her unilateral decision to place Student in residential treatment programs. Parent appeals each of the ALJ's conclusions as erroneous; the Court will address each argument in turn.

### 1.    Whether the District failed to implement Student's IEPs during the 2021-2022 school year (September 2021-June 2022)

Broken down, Parent's failure to implement claim is as follows: (1) Student had an excessive amount of absences during the 2021-2022 school year, culminating in Student eventually refusing to attend school in the Spring of 2022, (2) the absences and ultimate school refusal were "disability-related," (3) Student could not access his IEP-required SDI when he was not in school, (4) the District failed to adequately address Student's absences; therefore, (5) the District failed to implement Student's IEPs during the 2021-2022 school year. The ALJ rejected Parent's failure to implement claim, concluding that Parent did not establish that Student missed an excessive amount of school during the first semester, nor did Parent establish that the absences he did have that semester were disability related. As for the second semester, the ALJ agreed that Student missed a significant amount of school that semester but concluded that the District could

ORDER AFFIRMING DECISION OF ADMINISTRATIVE LAW JUDGE

not be faulted for those absences because they were Student's choice as opposed to a

manifestation of his disabilities.[9]

A failure to implement claim challenges whether the school properly provided the

specially designed instruction and other requirements set forth in the IEP; it does not challenge

the correctness or adequacy of the substantive content of the IEP itself. *See L.J. v. School Board*

*of Broward County*, 927 F.3d 1203, 1207 (11th Cir. 2019) (in an implementation claim, the parent

does not challenge the IEP "as written" but claims that school "failed to properly put the plan into

practice"); *Edward M.R. v. District of Columbia*, 660 F. Supp. 3d 82, 102 (D.D.C. 2023) ("[A]

challenge to the adequacy of an IEP differs from a challenge to a state agency or school's failure

to implement that IEP in the required manner—that is, the denial of a FAPE based, for example,

on the failure of an IEP to include a program for occupational therapy differs from a denial

premised on the state agency or school's failure to provide the student with the occupational

therapy prescribed in the IEP."). The Ninth Circuit has made clear that only "a *material* failure to

implement an IEP violates the IDEA." *Van Duyn*, 502 F.3d at 821 ("The language [of the IDEA]

counsels against making minor implementation failures actionable given that 'special education

and related services' need only to be provide '*in conformity with*' the IEP.") (emphasis in

original). It has further clarified that "[a] material failure occurs when there is more than a minor

---

[9]The parties and ALJ discuss Student's absences during the 2021-2022 school year in terms of first semester (September 2021-January 2022) and second semester (February 2022-June2022), so the Court will do so as well. In addition, while the timeframe for Parent's claims begins on June 26, 2021—*i.e.* before the 2021-2022 school year started—the ALJ determined that there was no evidence in the record "to establish whether the Student was or was not receiving the SDI in his March 2021 IEP from June 26, 2021 through the start of the 2021-2022 school year" and as such, concluded that Parent had not met "her burden with respect to this time period." AR 1897. Parent does not challenge this conclusion so the Court will not address whether the District implemented Student's IEP between June 26, 2021 and the start of the 2021-2022 school year.

ORDER AFFIRMING DECISION OF ADMINISTRATIVE LAW JUDGE

discrepancy between the services a school provides to a disabled child and the services required by the child's IEP." *Id.* at 822.[10]

### a.    First semester (September 2021 – January 2022)

Parent argues that Student missed so many classes during the first semester (September 8, 2021 - January 28, 2022) of the 2021-2022 school year that it prevented him from receiving his IEP-mandated SDI, thus constituting a material failure to implement the IEP by the District. The ALJ rejected Parent's failure to implement claim, concluding that the evidence failed to show that Student missed a significant amount of school between September 2021 and December 2021,[11] and of the absences he did have, the evidence did not demonstrate that Student missed class due to his disabilities; rather, the ALJ noted, the majority of the absences were either parent-excused or due to illness. The ALJ acknowledged that Student's absences increased in January 2022, but concluded that those absences were Student's personal choice, not disability related. Lastly, the ALJ found that that parent did not present evidence of a material shortfall to the SDI Student received on the days that he did attend school during the first semester.

Parent challenges each of the foregoing conclusions, arguing that they are not supported by the administrative record. The Court has reviewed the entirety of the administrative record and concludes that Student did, in fact, miss a significant number of class periods during the first semester of the 2021-2022 school year, but the evidence does not establish that the absences were

---

[10]The Court notes that Parent appears to conflate whether the District failed to implement Student's IEPs with whether the IEPs were reasonably calculated to address Student's disability-related absences. The latter addresses the appropriateness of the IEPs, an analysis that is distinct from whether they were properly implemented. Therefore, Parent's arguments regarding the same are not addressed here but are addressed in the next section (*infra* at page 30).

[11]The ALJ states that Student did not miss a significant amount school between "September and December 2022" (AR 1897 ¶ 13) but it is clear from the context that the ALJ meant December 2021, not 2022.

ORDER AFFIRMING DECISION OF ADMINISTRATIVE LAW JUDGE

disability related. Nor did Parent present evidence that Student did not receive his SDI on the days he attended school.

### 1) Student missed a significant number of class periods during the first semester

Jackson's attendance records show that between September 8, 2021 (the first day of the 2021-2022 school year) and December 17, 2021 (the last school day before winter break), Student was absent during 49 class periods. AR 3840-42. Six of the absences were "school related" and 32 were either due to "Illness," "Quarantine/Isolation," or excused by the Parent. *Id*. The remaining 11 absences were marked as "No Contact," which means that Parent did not contact the school about Student's absence. *Id*. Student's absences increased after he returned to school after winter break on January 4, 2022. Between January 4 and the end of the semester on January 28, 2022, Student missed at least another twenty class periods at Jackson. AR 3842. Of those missed class periods, seven were excused by Parent and the remainder are marked as "No Contact." *Id*. Although neither party submits guidelines as to what constitutes a "significant" number of absences, common sense dictates that missing at least 69 class periods in three months is certainly substantial. Therefore, this Court concludes that the record establishes that Student had a significant number of absences during the first semester of the 2021-2022 school year.[12]

### 2) Parent failed to demonstrate that the first semester absences were disability related

While the record establishes that Student missed significant instructional time, absences alone do not establish that the District materially failed to implement the IEP. To prevail, Parent

---

[12]Parent also argues that the ALJ erred by failing to consider evidence indicating that Student was absent from the Sno-Isle program for thirteen days during the first semester. However, as discussed above in footnote 3, the document Parent cites to as evidence of his absences from the Sno-Isle program was not admitted into evidence at the administrative hearing.

ORDER AFFIRMING DECISION OF ADMINISTRATIVE LAW JUDGE

- 20

must show that the absences were caused by, or directly related to, the District's failure to properly implement material provisions of the IEP. *See L.J. v. School Board of Broward County*, 927 F.3d at 1218 (IEP-implementation claim failed because student's "school aversion was not the result of an implementation failure"). Here, Parent argues that there "is overwhelming evidence" that Student's absences during the first semester were "a manifestation of his disabilities" and the District's "inept response" to Student's "disability-related school refusal" constitutes a material failure to implement his IEP. Dkt. No. 16 at 15-16. However, Parent points to no evidence in the record, nor could this Court locate any, that supports her claim that Student's absences between September 8 and December 17, 2021 were related to a manifestation of Student's disabilities triggered by an implementation failure by the District. Nor is there any evidence that if Parent believed student was exhibiting school avoidance during this timeframe, that she made the school aware of her concern. This is true particularly in light of the fact that the vast majority of Student's absences during this time were either due to illness or excused by Parent.

Parent cites to her declaration in which she states that she "noticed [Student] exhibiting signs of school refusal throughout his time at Jackson," but she does not claim that she made the school aware of this issue between September 8 and December 17, 2021. AR 3945. Nor does the other evidence cited by Parent indicate that Student was exhibiting school refusal during the relevant time period or that the school was aware of this potential issue. *See*, *e.g.*, AR 1976-79, Student's BIP dated 3/17/21, (no reference to school refusal); AR 2036-38, Student's BIP dated 3/15/22 (same); AR 1256-57, Student hearing testimony, (stating that one of the reasons he did not attend school during the 2021-2022 school year is because he was anxious; however, there is no indication that the District knew this is why he missed class between September 8, 2021 and

ORDER AFFIRMING DECISION OF ADMINISTRATIVE LAW JUDGE

December 17, 2022). Thus, the Court agrees with the ALJ that the school cannot be held accountable to Student's absences between September and December 2021.

The analysis is the same for Student's 20 absences between January 4 and January 28, 2022 (*i.e.*, between Student's return from winter break and the end of the first semester). At least two of those absences were related to Student's job and seven were excused by Parent. The other ten absences were because Student stopped attending his engineering class after the January 14 incident with the substitute teacher. Parent alleges this incident constituted an implementation failure because the substitute teacher denied Student his accommodation to leave class five minutes early. Dkt. No. 19 at 6 (Student "refused to attend his Engineering class due to an implementation failure during the first semester"). The Court disagrees with Parent for several reasons. First, the March 2021 IEP—the IEP in affect during the January 14 incident—did not include an accommodation for leaving every class five minutes early. *See* AR 1971. While the IEP included the "use of [an] Anytime Pass to return to case manager," there is no indication in the record that Student notified the substitute teacher that he wanted to leave early so he could go see Ms. Walker. AR 1971. Moreover, even if the IEP did include a requirement that Student be allowed to leave class five minutes early, failing to provide the accommodation during one class period once during the school year does not amount to a material IEP implementation failure. *See Van Duyn*, 502 F.3d 811 ("There is no statutory requirement of perfect adherence to the IEP, nor any reason … to view minor implementation failures as denials of a free appropriate public education.").

Lastly, Parent contends that Student's refusal to attend the engineering class was caused by anxiety triggered by this incident. However, there is no evidence in the record that Parent informed the District during this timeframe that Student was skipping his engineering class due to

ORDER AFFIRMING DECISION OF ADMINISTRATIVE LAW JUDGE

anxiety.[13] To the contrary, while a January 18 email from Parent to Ms. Walker does indicate that Student was "upset" after the January 14 incident, the email makes clear that Student was actually embarrassed by Ms. Walker's alleged actions (claiming that Ms. Walker talked to the Student about the incident in front of other students in the special education class) not the actual incident itself. AR 2647. The email also states that Student intended to skip his *social skills* class, not the *engineering* class, as a result of his embarrassment. *Id.* (email dated January 18, 2022 from Parent to Ms. Walker "[Student] said he didn't want to go to your [social skills] class because you said something about [the incident] 'in front of people.'"). Ms. Walker was concerned to hear that she had embarrassed Student and apologized to him the next time she saw him. AR 2655; *see also* AR 2658 (email dated January 19, 2022 from Ms. Walker to Student). Other school staff also reached out to Student following the incident to clarify that he was not in trouble and to "clear up" any misunderstanding. AR 2653-54, 2660. Student accepted Ms. Walker's apology and resumed attending his social skills class. Thus, far from an "inept" response to the January 14 incident, the District appropriately and effectively addressed the issue as it was presented to it at the time.[14]

Therefore, the Court concludes that while the record establishes that Student missed a significant number of class periods during the first semester, Parent failed to demonstrate that the absences were disability related or the fault of the District. The vast majority of the absences were

---

[13] Parent eventually notified the school via email that Student had been skipping the engineering class since the January 14 incident because he "had a problem with the sub" and that the substitute teacher "embarrassed" him because she "called [him] out" in front of the class, but those emails were sent on February 14, 2022 and March 15, 2022, long after the end of the first semester. AR 2682-83.

[14] Parent also objects to the ALJ's conclusion that Student's strong academic performance as reflected in his final first semester grades is "consistent with the conclusion that any deviation from the Student's IEP [during the first semester] was not material." AR 1898. Parent argues that "evidence of [Student's] achievement" not a proper evidentiary basis on which the ALJ should base her conclusion. This Court is not persuaded by Parent's objection. Here, the ALJ did not base her conclusion that the District did not materially deviate from the March 2021 IEP on Student's grades but, rather, found that his strong academic performance was "consistent" with that conclusion.

ORDER AFFIRMING DECISION OF ADMINISTRATIVE LAW JUDGE

- 23

1    excused and the record demonstrates that when the District was made aware of absences that were

2    not parent-excused and/or due to illness, it made efforts to support Student, including re-working

3    his class schedule so that he could attend the Sno-Isle program, convening an IEP Team meeting

4    to figure out how Student could continue working despite missing sixth period, and reaching out

5    to Student to apologize for embarrassing him after the January 14 incident. The Court concludes

6    that the ALJ properly determined that Parent did not meet her burden to establish that the District

7    materially failed to implement Student's IEP during the first semester of the 2021-2022 school

8    year.

9                      **b.    Second semester (February 2022-June 2022)**

10           The ALJ also determined that Parent did not establish that the District materially failed to

11   implement Student's IEP during the second semester. In reaching this conclusion, the ALJ agreed

12   that "Student's absences increased significantly" during the second semester and that the District

13   "was unable [to implement the Student's IEP] on the days that Student refused to attend school,"

14   but determined that the record did not "support a conclusion that the Student's school avoidance

15   stemmed from a failure on the part of the District." AR 1899. Rather, the ALJ found that "a

16   preponderance of the evidence indicates that the Student skipped school because he preferred to

17   hang out with friends and thought that since he already knew what he wanted to do and knew the

18   basics for that career, there was little benefit to school." *Id*. Therefore, the ALJ concluded, Parent

19   failed to meet her burden to establish that the District materially failed to implement Student's

20   IEP during the second semester.

21           Parent objects to the ALJ's conclusion. She argues that the District's efforts to get Student

22   to attend school during the second semester were useless in light of his "disability symptoms that

23   prevented his attendance in the first place" and therefore his continued absences constitute a

ORDER AFFIRMING DECISION OF ADMINISTRATIVE LAW JUDGE

- 24

material implementation failure by the District. Dkt. No. 16 at 18. In other words, Parent argues that Student's excessive absences between February 2022 and June 2022 were a manifestation of his disabilities triggered by the District's failure to properly recognize and/or address Student's struggles. Therefore, Parent claims, Student's very school refuse demonstrates that the District materially failed to implement his IEP.

> **1)    Whether a preponderance of the evidence supports the ALJ's conclusion that the District "cannot be faulted" for Student's absences**

As stated above, the ALJ concluded that although the District was unable to implement Student's IEP on the days that he was not in school, it could not be faulted for Student's school avoidance because his absences were his choice rather than a failure on the part of the District. Parent argues that in making this determination, the ALJ ignored "uncontroverted" evidence in the record that Student "stopped attending school due to anxiety, depression, and low self-esteem" and because he "formed unhealthy relationships due to the same." Dkt. No. 19 at 6. Parent cites to the following evidence:

- Student's BIP from tenth grade that lists "Anxiety Behaviors" as one of his Target Behaviors (AR 1977);

- Student's BIP from eleventh grade that lists "Anxiety Behaviors" as one of his Target Behaviors (AR2036) and states that staff should teach Student to "recogniz[e] the changes in his body for anxiety, anger, aggression" (AR 2037);

- Parent's declaration in which she states that Student "became engaged in the negative cycle with his anxiety, depression, and challenging behaviors" once Jackson returned to in-person learning in the Spring of his tenth grade year (AR 3844); She also states that she noticed Student "exhibiting signs of school refusal throughout his time at Jackson" (AR 3945);

- Parent's testimony that she notified Ms. Walker before Student started his ninth grade year at Jackson that he had anxiety and, as a result, Ms. Walker set up a private tour of the school for him before school started (AR 580), Parent's

ORDER AFFIRMING DECISION OF ADMINISTRATIVE LAW JUDGE

testimony that the District was aware of Student's "social anxiety and challenges in the school setting," including that Student "had been punched and slapped" by other students during his ninth grade year (AR 3943); that Student did not want to return to Jackson after his Fairfax hospitalization in ninth grade (AR 584), that she discussed with Ms. Walker that in August 2021 that Student's "anxieties were high" (AR 1027), that she sent a note to the school on the first day of the 2021-2022 school year "saying the Student has very high anxiety about the first day of school" and again in September stating that Student "was pretty distressed" (AR 585, 1024-25, 1027), that she told Ms. Walker "early in the fall of 2021" that Student was "feeling very distressed by" a "certain peer group," and that Jackson is overwhelming and overstimulating for Student (AR 1027-28), that Student hated going to school because he "felt targeted ... by ...the District and administration (AR588-89), stating that Student would come home from school upset and dysregulated (AR 1103-04); claiming that Student's "self-esteem went down" due to his lack of success at the Sno-Isle program (AR1229-30), and testifying about Student's struggles at Triumph, Provo Canyon, and SPARK (AR 1072, 1084-85);

- Ms. Walker's testimony that Parent shared her concerns about Student's anxiety-related issues with her during the 2021-2022 school year (AR 968) and agreeing that if Student was not attending school, "it would have been challenging" to deliver the IEP-mandated SDI to him (AR 473);

- Ms. Gackle's testimony that Student was anxious about attending his engineering class (AR 723);

- Ms. Stoddard's testimony that staff discussed at meetings that Student was having emotional challenges (AR 814);

- Dr. Cluff's testimony that Student has a nonverbal learning disorder that makes it difficult for him to connect with his peers, causing Student to feel "overwhelmed," "exhausted," and "defeated." (AR 301-07, 347-52); and

- Mr. Moss's testimony that Student's disabilities made him more at-risk for heightened anxieties and anger and not being able to tolerate distressing situations. AR 186-87, 190-93.

*Id*. at 6, 8; Dkt. No. 16 at 15-17.[15]

---

[15]Parent cites to other documents and testimony in the record, *e.g.*, AR 418-19, 425, 563-64, 568, 737-38,954, 971-72, 1051-54, 1062, 1066-67, 1972, 1982, and 2043, but this evidence is either not relevant to the issue at hand or is miscited, *e.g.*, misattributing Robin Arnold's testimony at AR 877-883 to Virginia Alonzo.

ORDER AFFIRMING DECISION OF ADMINISTRATIVE LAW JUDGE

The problem with the foregoing evidence is that the majority of it does not relate to Student's attendance during the second semester of the 2021-2022 school year, and the evidence that does pertain to the second semester, does not establish that Student's absences were caused by his disabilities. For instance, while Student's BIP from eleventh grade identifies anxiety as a target behavior, the description of his anxiety-related behaviors does not include refusing or failing to attend classes. And while Dr. Cluff testified that Student's disability-related anxiety caused him to affiliate with negative peer groups and to self-medicate with cannabis, which "undoubtedly [] interfered with [school] attendance," he did not think that Student's difficulty with peer relationships and/or drug use constituted "substantial variable[s]" in Student's poor school attendance. AR 320; *see also* AR 321 (Q: Dr. Cluff, did you ever indicate that – to anyone, including the School District, that the Student's primary issue for challenges in the school setting was due to drug use and peer relationships? A: No."); AR 322 (stating that Student's anxiety, depression, and low self-esteem were "exacerbating factors" to his issues at school, "but [they were] far down the line. They didn't help, but they certainly aren't - - I can't see any way to hold them accountable for him not being able to access his education.").

On the other hand, Student testified at the hearing that he had "extreme amounts of anxiety" in Jackson's "larger classrooms as well as around [] other kids just because of all the stuff that was occurring to [him] peer-wise," which factored into his ability to attend school during the 2021-2022 school year. AR 1256-57; *see also* AR 1248, 1251 (testifying that he always had trouble making friends and he was "bullied and teased" by his peers at Jackson, which made him "want to go" to school "less and less"). Student's testimony is corroborated by an April 27, 2022 email from Parent to Ms. Burdick, Ms. Walker, and Ms. Felder, in which she states that Student "hates going into [Jackson's] building" and that he "never has done well with that large

ORDER AFFIRMING DECISION OF ADMINISTRATIVE LAW JUDGE

- 27

of school." AR 3131; *see also* AR 2873 (May 10, 2022 email from Parent to Ms. Burdick, Ms. Walker, and Ms. Felder stating that Student is unwilling to "attend [Jackson] in person" but was "willing to do some work online").

However, Student also testified at the hearing that he stopped attending school because he thought it was a waste of time (AR 1251: "I wasn't really learning anything" ; AR 1252: "'why stay at school when I could be making money' or something like that, you know?"; "I already felt that I knew kind of what I needed to know on the basics to do kind of the career that I wanted to . . . And I just, you know, figured I don't need it. And, you know, it is  -- like what is the benefit of it if I'm like taking time away from me gaining skills in the industry I want to go into, when I'm just at school learning stuff that is irrelevant and stuff like a person in like elementary school would be doing and learning."). Student also testified that beginning sometime around February 2022,[16] he started hanging out with gang members and drug dealers, and that on the days he did not attend school, it was because he went to hang out with them. AR 1243-1247 (stating that he "went to hang out with my friends who were gang members"). He testified that he hung out with the gang members because they "made [him feel] protected because [he] knew they wouldn't let anything happen to [him]. And they also made [him] feel like kind of cool and powerful because people would see [them] in public and be like, 'oh yeah, we don't want to mess with those guys.'" *Id*. at 1248.

Student's testimony that he missed school during the second semester due to lack of interest and a desire to hang out with friends is corroborated by other evidence in the record. For instance, his English teacher at the time, Ms. Baker, testified that during the second semester,

---

[16]He later testified that he did not begin to hang out with the gang members until mid-May 2022. AR 1258.

1    Student "was thinking about [his job] all the time" and she tried to figure out ways to convince

2    Student that attending school was worth it. AR 139, 142; *see also* AR 149 (testifying that Student

3    did not think school was "important" and that "he would rather just go to work"). Ms. Baker

4    further testified that Parent told her she was going to enlist the help of Student's boss because he

5    is a "great influence," and he will tell the Student that he needs to finish school. *Id*. at 147. Parent

6    also testified that she noticed in May 2022 that Student began hanging out with a new group of

7    friends who were "not motivated in school." AR 1200.[17]

8        In light of the foregoing evidence, the Court agrees with ALJ's conclusion that Student's

9    school refusal during the second semester was his personal choice as opposed to a manifestation

10   of his disabilities triggered by a failure by the District to implement his IEP. The Court

11   acknowledges that Student testified that he had extreme anxiety that factored into his ability to

12   attend school, but read in its entirety and in light of the corroborating evidence, including that

13   Student continued to exhibit school refusal when he was removed from the Jackson environment,

14   the Court concludes that Student's testimony more accurately reflects that by the second semester

---

[17]Parent relies on *Middleton v. D.C.*, 312 F. Supp. 3d 113 (D.D.C. 2018) in support of her failure to implement claim; however, the court's analysis of the implementation claim in that case did not include reference to the student's attendance. *Id*. at 144-45. Rather, the court discussed student's absences in context of the appropriateness of the student's placement. *Id*. at 145-46 ("Record evidence reveals that [the student's] attendance issues stemmed, in large part, from his inappropriate placement in diploma-track classes and in a non-self-contained program. In light of that evidence and the fact that [the school] failed to correct either of those problems, the Court concludes that [the school] denied [the student] a FAPE by failing to properly address his attendance issues.").

ORDER AFFIRMING DECISION OF ADMINISTRATIVE LAW JUDGE

of the 2021-2022 school year, Student chose to not attend school because he preferred to hang out with his new friends and he did not see the point of attending school.[18, 19]

### 2. Whether the District Failed to Develop Appropriate Programming for Student

Parent next alleges that the ALJ erred in rejecting her claim that the District failed to develop appropriate programming for Student during the 2021-2022 school year. She raises three challenges to the appropriateness of Student's IEP: (1) the District should have revised the March 2021 IEP after the first semester (*i.e.*, after January 28, 2022), (2) the March 2022 IEP was inappropriate when developed, and (3) the District should have revised the March 2022 IEP in light of Student's continued absences. The Court will address each argument in turn.

### a. Legal standard for determining the appropriateness of an IEP

The appropriateness of a student's IEP is judged by reviewing the IEP's goals and services at the time it was developed and determining whether the programming was reasonably calculated at that time to confer educational benefit. A*nchorage Sch. Dist. v. M.P.*, 689 F.3d 1047, 1057-58

---

[18]Parent also argues that the ALJ improperly relied on *L.J. v. School Board of Broward County* to justify her conclusion that the District did not fail to implement Student's IEPs during the 2021-2022 school year. 927 F.3d 1203 (11th Cir. 2019). Parent misconstrues the ALJ's reliance on the case. The ALJ did not rely on *L.J. v. School Board of Broward County* to establish that the District's actions or inactions here constituted an implementation failure; rather, the ALJ simply relied on the case for the proposition that if Student's school absences did not "stem[] from a failure on the part of the District," then "the District cannot be faulted for the Student's absences." AR 1899.

[19]Parent also alleges—for the first time in her response brief—that the District failed to implement the Student's IEP by not providing SDI minutes in all areas of eligibility, failing to provide the minutes through a special education teacher, and failing to provide his math SDI in a special education setting. First, the Court notes that the foregoing are improper arguments raised for the first time in Parent's reply brief. *See United States v. Kama*, 394 F.3d 1236, 1238 (9th Cir. 2005) (an issue not "specifically and distinctly" raised in the opening brief is waived). Second, even if the Court were to address the merits of the allegations, it is entirely unclear what Parent is arguing because she simply states the allegations, followed by a string citation to the record, with no explanation of how the citations are applicable. As the Ninth Circuit has explained, "a cursory mention of an issue" without "citation to legal authority is insufficient ...." *Momox-Caselis v. Donohue*, 987 F.2d 835, 842 (9th Cir. 2021); *see also United States v. Zannino*, 895 F.3d 1, 17 (1st Cir. 1990) ("It is not enough merely to mention a possible argument in the most skeletal way, leaving the court to do counsel's work, create the ossature for the argument, and put flesh on its bones ...."); *In re Basquez*, 2020 WL 6929242, *2 (C.D. Cal. Nov. 16, 2020) ("Court often deny motions when moving parties fail to provide developed legal reasoning or to sufficient case authority in support of motions.").

ORDER AFFIRMING DECISION OF ADMINISTRATIVE LAW JUDGE

(9th Cir. 2012); *see also Adams v. State of Oregon*, 195 F.3d 1141, 1149 (9th Cir. 1999) ("Instead of asking whether the [IEP] was adequate in light of [the student's] progress . . . the more pertinent question [is] whether the [IEP] was appropriately designed and implemented so as to convey a meaningful benefit [to the student]."); *Baquerizo v. Garden Grove Unified Sch. Dist.*, 826 F.3d 1179, 1187 (9th Cir. 2016) (stating that the appropriateness of an IEP is based on the information that was reasonably available to the parties at the time). Even if hindsight indicates that a student could have done better with more or different IEP services, that alone does not show a denial of FAPE. Further, "[a]ny review of an IEP must appreciate that the question is whether the IEP is *reasonable*, not whether the court regards it as ideal." *Endrew F.*, 580 U.S. at 399 (emphasis original,). The IDEA "relies heavily upon the expertise of school districts," *Schaffer v. Weast*, 546 U.S. 49, 59 (2005), thus courts must afford deference to the judgment of education professionals in implementing it, *Rowley*, 458 U.S. at 206 (courts should not "substitute their own notions of sound educational policy for those of the school authorities which they review."); *see also Tice ex rel. Tice v. Botetourt Cnty. Sch. Bd.*, 908 F.2d 1200, 1207 (4th Cir. 1990) ("Neither the district court nor this court should disturb an [individualized education program] simply because we disagree with its content.").

    **b.**  **Whether the District should have revised the March 2021 IEP at the end of the first semester (*i.e.*, after January 28, 2022)**

    Parent contends that the District should have revised Student's March 2021 IEP at the end of the first semester (after January 28, 2022) because he "barely made it through" that semester, and only did "due to intensive and recurring interventions by [Parent], as well as considerable work excusal and assignment reductions by teachers aimed at boosting [Student's] grades to a passing level." Dkt. No. 16 at 21. According to Parent, Student's "near-failing grades throughout

ORDER AFFIRMING DECISION OF ADMINISTRATIVE LAW JUDGE

1    the majority of the first semester, combined with the considerable assistance [Student] received

2    from his teachers to achieve passing grades, put [the District] on notice that [Student's] IEP was

3    not reasonably calculated to deliver [Student] a FAPE." *Id*. at 22.

4          The Court disagrees with Parent's assessment. Parent points to Student's interim grade

5    report during the first semester that shows he was earning two "Cs" and a "D," as evidence that

6    the March 2021 IEP was not sufficient. However, two "Cs" and a "D" are passing grades and as

7    courts have repeatedly held, the IDEA does not require an IEP to maximize a student's potential;

8    it merely must ensure that the student progresses as is "appropriate in light of the child's

9    circumstances." *Endrew F.*, 580 U.S. at 399-400. Moreover, the evidence establishes that when

10   Parent reached out to Student's teachers to see how he could increase his grades, they were all

11   responsive and accommodating. Parent asserts that the teachers applied lower standards or

12   significantly decreased Student's workload so that he could pass the classes but, once again, the

13   evidence contradicts Parent's claim. First, while Student was allowed to submit shortened or

14   alternative assignments late, this is consistent with the accommodations in his IEP, which

15   included shortened assignments and extra time to complete assignments. Second, Student's

16   teachers testified that many of the options they offered to Student to help him get caught up on his

17   work were offered to all of their students. *See, e.g.*, AR 88 (Mr. Poe: "I have a folder of make-up

18   assignments for all of my students. [These assignments] weren't specifically for the Student."), 89

19   (same), 95 (same), AR 119 (Ms. Baker testifying that she offered "summative assignments" to all

20   of her IEP or 504 students), 134 (Ms. Baker stating that many of her students have flexible

21   deadlines or additional time); 2755 (May 11, 2022 email from Ms. Baker to Parent stating "I have

22   a policy that any student can propose a way to show the skills of the class to replace the

23   Summatives (70%) for the course."); 2669 (January 10, 2022 email from Mr. Iversen to Parent:

24   ORDER AFFIRMING DECISION OF ADMINISTRATIVE LAW JUDGE

25

"I'm allowing students to complete any missed work for credit, with little or no point deduction for late work. (no deduction for [Student]).". By taking advantage of the accommodations offered through the March 2021 IEP, as well as the opportunities offered to all student, Student earned three "As," an "A-," and a "B" by the end of the first semester, directly contradicting Parent's claim that he "barely made it through" the semester.

Parent relies on *Hall by Hall v. Vance Cnty. Bd. of Educ.*, 774 F.2d 629 (4th Cir. 1985) and *D.B. v. Bedford Cnty. Sch. Bd.*, 708 F. Supp. 2d 564 (W.D. Va. 2010) to support her claim that the fact that Student ultimately received strong grades by the end of the first semester is not evidence that the March 2021 IEP was appropriate. However, both cases are distinguishable from the present situation. In *Hall*, a student who was functionally illiterate and received poor grades, was promoted to fifth grade because the school had a policy that prohibited students from repeating two grades in a row. *Hall*, 774 F.2d at 630-31. In *D.B.*, a student who was unable to read, write, or spell was advanced grades levels due to "social promotion." *D.B.*, 708 F. Supp. 2d at 584-85. Here, there is no evidence that Student's grades were due to school policy or otherwise not earned. Thus, this Court concludes that a preponderance of the evidence supports the ALJ's determination that the District was not required to revise the March 2021 IEP.

### c.    Whether the March 2022 IEP was appropriate at the time it was developed

Parent next argues that the March 2022 IEP was not appropriate at the time it was developed because it did not address the underlying cause of Student's school refusal, "despite acknowledging" that his absences were "anxiety-related." Dkt. No. 16 at 23.  Parent points out that by the time the IEP Team met on March 15, 2022 for its annual review of Student's IEP, he had already missed 56 class periods just six weeks into the second semester. In addition, Parent

ORDER AFFIRMING DECISION OF ADMINISTRATIVE LAW JUDGE

claims, the IEP Team knew that Student was struggling at attend the Sno-Isle program. Yet, despite being aware of these issues, the March 2022 IEP and BIP remained "largely unchanged from 2021." Dkt. No. 19 at 10.

The Court concludes that the record evidence does not support Parent's allegations. First, contrary to what Parent alleges, there is no evidence in the record that Student's IEP Team was aware that he was struggling to attend the Sno-Isle program at the time of the March 2022 IEP meeting. Instead, the evidence establishes that the earliest members of his IEP Team became aware of Student's Sno-Isle attendance issues was April 20, 2022 when the program transmitted its third quarter grades to the District. Second, of the 56 class periods Student missed at Jackson during the first six weeks of second semester—*i.e.*, the absences of which the IEP Team was aware at the time it developed the March 2022 IEP—15 were because Student was on vacation, one was school-related, and 19 were excused by Parent. AR 3843-44.

As for the unexcused absences, the majority of them were in Student's engineering class. The evidence establishes that the IEP Team was aware of and addressed the issue in the March 2022 IEP. The Team discussed that Student had anxiety around attending his engineering class because he worried about his peers' perception of him and how far behind he was on the work. To address this issue, the Team developed a plan for Student to complete his missing assignments in Ms. Walker's classroom with his preferred paraeducator, Ms. Fisher. The Team hoped that once they addressed the root of Student's anxiety, he would feel comfortable returning to class. The team also developed a BIP that addressed Student's refusal to engage in schoolwork and his anxiety behaviors. The BIP included teaching him to recognize feelings of anxiety and apply strategies for emotional self-regulation, including problem solving, asking for breaks or help when needed, and breaking down assignments and setting short-term goals. AR 2037. The BIP

ORDER AFFIRMING DECISION OF ADMINISTRATIVE LAW JUDGE

- 34

1    also included a positive reinforcement system, self-initiated or prompted breaks, opportunities for

2    Student to work with preferred staff to complete assignments, and student-directed goal setting.

3    *Id*.

4              Nor is the Court persuaded by Parent's reliance on *Middleton v. D.C.*, a case in which a

5    district court concluded that a student was denied a FAPE because, among other reasons, the

6    school failed to address the student's anxiety-related attendance issues. 312 F. Supp. 3d 113

7    (D.D.C. 2018). The *Middleton* case is distinguishable from the instant case. *Middleton* involved a

8    situation where the school district made significant changes to the student's IEP without

9    consulting student's IEP team, his parent, or his education advocate. *Id*. at 137, 144. The changes

10   included removing the student from a small, self-contained program to placing him on the

11   "diploma track" in "a much larger" environment where the student had to "independently

12   navigate transitions," despite his well-documented and significant disabilities. *Id*. at 143-44. As a

13   result, the student "constantly missed classes, roamed the hallways, avoided the lunchroom, and,

14   on many occasions disengaged in the classroom." *Id*. at 144. The *Middleton* court concluded that

15   the school's unilateral placement of the student "on the diploma track" was not reasonably in light

16   of his significant learning deficits. *Id*. at 144 ("[Student's] placement [on the diploma tract]—a

17   decision apparently made "downtown" rather than by [student's] IEP Team—was not reasonable

18   calculated to enable him to progress appropriate in light of his circumstances."). The *Middleton*

19   court further concluded that the school's attempt to address the student's attendance issues by, for

20   instance, having the school psychologist periodically walk him to class, was insufficient given the

21   inappropriateness of student's placement. *Id*. at 147 ("The school district either knew or

22   reasonably should have known that [student's] [attendance] issues stemmed from his

23   inappropriate placement.").

24   ORDER AFFIRMING DECISION OF ADMINISTRATIVE LAW JUDGE

25    - 35

Here, in contrast, Student's absences cannot be linked to a dramatic change in his IEP and the District attempted to work with both Parent and Student to strategize ways to support Student and to increase his engagement in school. Therefore, the Court concludes that a preponderance of the evidence establishes that the March 2022 IEP was appropriate at the time it was developed by the IEP Team.

### d. Whether the District should have revised the March 2022 IEP

Lastly, Parent argues that Student's IEP Team should have revised the March 2022 IEP when Student's absences ramped up significantly in the Spring of 2022. Instead, Parent charges, beginning at the end of May 2022, the District "entirely abandoned the March 2022 IEP" and instead knowing permitted Student to fail the engineering and Sno-Isle courses. In addition, the District allowed Student to start remote learning despite knowing that he had not been successful in the past. Finally, Parent asserts that the District should have revised the IEP in July 2022.

Parent's main objection to the District's actions during this time appears to be what she claims was the "staff's emphasis on graduation planning and credit obtainment" as opposed to ensuring that Student received a FAPE. Dkt. No. 16 at 24. The Court does not find this to be a fair assessment of the District's actions during the Spring of 2022. Beginning in April 2022, Parent began emailing Ms. Walker, Student's teachers, and other staff members at Jackson to let them know that she was having a difficult time getting Student to attend school and that her and Student's priority had become finding a way forward so that Student could graduate. *See*, *e.g*., AR 3131 (April 27, 2022 email from Parent to Ms. Walker and other staff members: "I am having a difficult time getting [Student] to attend class in person. He said he doesn't want to go to [Jackson] anymore but wants to graduate. He wants to do online school, but I am not sure that

ORDER AFFIRMING DECISION OF ADMINISTRATIVE LAW JUDGE

1    would be an option would it?"); 3169 (May 5, 2022 email from Parent to Ms. Walker and other

2    staff members: "[Student] is not going to sno-isle so that he can focus on graduating. I was very

3    surprised he made that decision, but again, knowing how he hates school and wants it over, it

4    makes sense."); 3175 (May 10, 2022 email from Parent to Student's teachers: "I am contacting

5    you all because we are having alot [*sic*] of issues getting [Student] to complete he [*sic*] school

6    year. We have explained he is so close to getting credit for this year and to throw it away in mid

7    May, is not wise thing to do. At this point, we want to get him through and are ok with a D to get

8    the credit. Would each of you be able to get me the MINIMUM amount of work required to life

9    his Grade to a D."). Thereafter, Student's teachers and staff at Jackson, including Ms. Felder, the

10   Graduation Success Coordinator, met with and emailed both Student and Parent, informing him

11   how he could improve his grades and letting him know about various alternative programs in the

12   District that he could attend and graduate from. *See*, *e.g.*, AR 3177, 3181, 3176 (May 10, 2022

13   email from Ms. Felder to Parent: "I am sorry to hear he's having such a difficult time. My hope is

14   he'll consider coming to the meeting so he can hear about some of the options available to him. I

15   believe there is a path to graduation for him that he will feel comfortable with."). The Court

16   concludes that the District should not be faulted for collaborating with Parent and Student to help

17   him achieve their stated goals: credit attainment and graduation.

18           Parent also objects to the fact that the District granted Student's May 12, 2022 request to

19   work remotely for the remainder of the school year. The Court concludes that this was reasonable

20   accommodation by the District given that Parent had repeatedly stated that Student did not like

21   entering Jackson's building (*e.g.*, AR 3131 April 27, 2020 email from parent to Ms. Walker and

22   other staff members "We just want [Student] to graduate but he hates going into [] [Jackson's]

23   building. He never has done well with that large of school."), that the Student indicated that he

24   ORDER AFFIRMING DECISION OF ADMINISTRATIVE LAW JUDGE

25

was only willing to continue to work if he could do it remotely (AR 3176 May 10, 2022 email

from Parent to Ms. Walker and other staff members: "[Student] did say he didn't want to attend

[Jackson] in person but was willing to do some work online"), and given that Student had

experienced some success with online learning during the COVID pandemic (AR 3944 Parent

testifying that Student's mental health "improved somewhat" during remote learning due to

COVID "as a result of the decreased social stressors of the school environment. His anxiety

decreased"; AR 1982 Parent sharing with IEP Team that "being away from the school

environment and friends" during remote learning for COVID had "been very good for him").

Lastly, Parent argues that the District should have revised Student's IEP in July 2022 after

Student was hospitalized on June 14, 2022. On June 16, 2022, Parent's counsel sent the District a

letter informing it that Parent intended to place Student in a residential treatment program and to

seek reimbursement from the District for the cost of the private placement. On June 17, 2022,

Student was admitted to Smokey Point and on July 1, 2022, the IEP Team met to discuss Parent's

intent to place him in a residential facility. During that meeting, the IEP Team determined that

Student's "needs have changed since his last evaluation in March 2020." AR 2068. Therefore, the

District concluded that Student needed "a comprehensive reevaluation" that would include a

functional behavioral assessment "in coordination with [Student's] providers at Smokey Point

Behavior Health." *Id*. The Team stated that the reevaluation was necessary to "inform [its]

recommendation for program placement and development of an IEP to meet [Student's] current

needs." *Id*.

As an initial matter, the Court notes that the time period for Parent's claims ends on July

1, 2022. *See* AR 1408 (August 8, 2023 email from Parent's counsel confirming that "the relevant

time period" for Parent's claims is June 26, 2021 through July 1 2022). Thus, any allegation

ORDER AFFIRMING DECISION OF ADMINISTRATIVE LAW JUDGE

regarding the District's obligation to revise Student's IEP subsequent to this date must be

rejected. And while the Court agrees with Parent that a new IEP was needed after Student's June

17, 2022 hospitalization, the Court also agrees with the District and the ALJ that given the new

behaviors Student was exhibiting as reported by Parent and the Smokey Point treatment records—

*e. g.*, increasingly dark ideation, aggression, safety concerns at home, and association with gang

members and drug dealers—a new evaluation of Student was necessary in order to develop an

appropriate IEP. Indeed, it would have been inappropriate to develop an IEP without a

reevaluation given Student's new behaviors. The IEP Team first became aware of Student's new

behaviors—and the corresponding need for a new evaluation—during the July 1, 2022 IEP

meeting, thus the District was not required to develop a new IEP for Student between his

hospitalization on June 17 and the IEP meeting on July 1. Therefore, the Court agrees with the

ALJ's conclusion that Parent failed to establish that the District denied Student a FAPE by failing

to amend his IEP in July 2022.

### 3. Parent Is Not Entitled to Reimbursement for Student's Placement in Residential Treatment Programs

A parent who unilaterally enrolls their child in a private school is entitled to

reimbursement only if (a) the district placement violated the IDEA and (b) the private placement

is proper under the IDEA. *Forest Grove Sch. Dist. v. T.A.*, 557 U.S. 230, 246 (2009); *see also*

*Edmonds School District v. A.T.*, 780 Fed. Appx. 491, 494 (9th Cir. 2019) (citing *Ashland Sch.*

*Dist. v. Parents of Student E.H.*, 587 F.3d 1175, 1183 (9th Cir. 2009) ("We employ a two-prong

test to determine whether a parent or guardian may obtain reimbursement for the costs of private

school placement, asking whether (1) the public placement offered by the school district violated

the IDEA, and (2) the private school placement was "proper" under the Act."). Because this Court

ORDER AFFIRMING DECISION OF ADMINISTRATIVE LAW JUDGE

- 39

concludes that the District complied with the procedural and substantive requirements of IDEA, Parent cannot satisfy the first prong of the reimbursement test. Therefore, Parent is not entitled to reimbursement for her unilaterally placement of Student in the residential treatment programs.

## V. CONCLUSION

For the foregoing reasons:

1. The ALJ's decision on Parents' IDEA claims is AFFIRMED;

2. Defendant's cross motion for summary judgment (Dkt. No. 18) is GRANTED;

3. Plaintiff's motion for summary judgment (Dkt. No. 16) is DENIED;

4. The case is HEREBY DISMISSED.

Dated this 16th day of October 2025.

Barbara Jacobs Rothstein
U.S. District Court Judge

ORDER AFFIRMING DECISION OF ADMINISTRATIVE LAW JUDGE

- 40